

1997 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-9-1997

# United States v. Pelullo

Precedential or Non-Precedential:

Docket 95-1829,95-1856

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

Recommended Citation

"United States v. Pelullo" (1997). *1997 Decisions*. Paper 8.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/8

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

Nos. 95-1829 and 95-1856
_____


UNITED STATES OF AMERICA

vs.

LEONARD A. PELULLO,

Appellant.

_____


APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

(D.C. Criminal No. 91-cr-00060)

_____


ARGUED APRIL 24, 1996

BEFORE:  BECKER, NYGAARD and LEWIS, Circuit Judges.

(Filed January 9, 1997)

_____


W. Neil Eggleston (ARGUED)
Howrey & Simon
1299 Pennsylvania Avenue, N.W.
Washington, DC  20004-2402

    Attorney for Appellant

William B. Carr, Jr. (ARGUED)
Frank A. Labor, III (ARGUED)
Ronald G. Cole
Office of United States Attorney
615 Chestnut Street
Philadelphia, PA  19106

          Attorneys for Appellee

_____

OPINION OF THE COURT
_____


LEWIS, Circuit Judge.

I.

          This appeal represents the third time this case has come before our court.  On both previous occasions we reversed Pelullo's convictions.  See United States v. Pelullo, 964 F.2d 193 (3d Cir. 1992) ("Pelullo I") (reversing all but one of Pelullo's fraud convictions due to the erroneous admission of unauthenticated bank records); United States v. Pelullo, 14 F.3d 881 (3d Cir. 1994) ("Pelullo II") (reversing all of Pelullo's convictions on the ground that it was error to invoke the doctrine of collateral estoppel with regard to the single wire fraud conviction upheld in Pelullo I).

          The procedural history of this case, particularly as it involves Pelullo's first trial, helps place in context the issues raised in this appeal, and we begin with a discussion of that trial.

A.

          When Pelullo was first indicted, he was the Chief Executive Officer of The Royale Group, Limited ("Royale"), a

2

publicly held corporation. The indictment alleged that as its CEO, Pelullo had engaged in a series of illegal schemes to defraud Royale. Paramount among these for our purposes was Count 54 of the indictment, which charged Pelullo with wire fraud. Specifically, Count 54 alleged that in early 1986, Pelullo diverted $114,000 from a Royale subsidiary to pay-off part of a $250,000 personal loan owed to Anthony DiSalvo, a loanshark purported to have ties to the Philadelphia mafia. The indictment also alleged that Count 54 constituted a predicate act, Racketeering Act 60, for a separate RICO count.

The government's case against Pelullo on Count 54 was based primarily upon the testimony of two government agents, FBI Agent Randal Wolverton and IRS Agent James Kurtz; and an admitted mafia underboss, Philip Leonetti. In particular, Wolverton testified that Pelullo had admitted in an interview with FBI agents to using the $114,000 to pay-off DiSalvo. In addition, there was testimony establishing that after Pelullo initially failed to repay the $250,000 loan, DiSalvo sought the assistance of Leonetti in an attempt to collect the outstanding debt. In fact, Leonetti testified that he met with Pelullo in January 1986 at the Florida home of Nicodemo Scarfo, the reputed boss of the Philadelphia Mafia, to inform Pelullo that he had to repay DiSalvo. In late February of 1986, Pelullo wired $114,000 from a business bank account to a family corporation in Philadelphia. The transferred money was allegedly converted to cash by Arthur Pelullo, Leonard Pelullo's brother, and given to Peter Pelullo,

3

Leonard Pelullo's other brother, to drop-off at DiSalvo's home in Philadelphia.

In response to the government's case, Pelullo took the stand in his own defense and, among other things, contradicted Wolverton's claim that he had admitted to using Royale funds to repay his personal debt to DiSalvo. Instead, he testified that the loan had not been paid-off until the Summer of 1986 and that the $114,000 in question had been used to repay an intercompany debt earlier that same year. See Appellant's Br. at 10. The jury, apparently unpersuaded by Pelullo's testimony on this and other matters, returned a guilty verdict on all counts of the indictment. As noted earlier, however, on appeal we reversed all of Pelullo's convictions from his first trial, except for his conviction of wire fraud on Count 54.

Sometime after Pelullo's first appeal, but before his retrial, the defense obtained potential impeachment evidence from the government that the government had withheld despite Pelullo's repeated production requests. The withheld evidence consisted of an IRS memorandum, which detailed Leonetti's interview with IRS Agent Kurtz. The memorandum contained references to meeting dates between Pelullo and Leonetti that directly contradicted Leonetti's testimony at trial.

On retrial, Pelullo was again found guilty on all counts. Thereafter, he filed a Rule 33 motion for a new trial on Count 54 based on the fact that during the first trial the government had withheld potential impeachment evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963), which creates

4

a duty on the part of the government to provide the defense with potentially exculpatory or impeachment evidence.  See also United States v. Bagley, 473 U.S. 667, 676 (1985) (noting that impeachment evidence falls within the Brady rule).  The district court denied Pelullo's Rule 33 motion, and Pelullo appealed that ruling as well as his convictions from the second trial.

On the second appeal, we affirmed Pelullo's conviction on Count 54 on the grounds that the withheld IRS memorandum did not lead to a "reasonable probability" that the outcome of the first trial would have been different had the government turned the memorandum over prior to the first trial.  See Pelullo II, 14 F.3d at 887.  We reversed Pelullo's convictions, however, on all other counts.  Specifically, we held that the district court erred in according Pelullo's prior conviction on Count 54 preclusive effect in Pelullo's second trial.  Id. at 897.

At some point following Pelullo's second trial, but before the beginning of his third trial (which ended in a hung jury), the government turned over to the defense three more pieces of potential impeachment evidence, which Pelullo's counsel had repeatedly requested since the first trial.  Pelullo contends that each of the three items undermined the testimony of the government agents and Leonetti and supported his claim that in early 1986, he had used the $114,000 to pay-off an intercompany debt.  This evidence consisted of:  (1) rough notes of FBI Agent Wolverton taken during an interview with Pelullo, which included the notation "repaying intercompany debt," a statement that had not appeared in the FBI 302 report; (2) rough notes of IRS Agent

5

Kurtz taken during an interview with Leonetti, which referenced a date, "Summer 1986," which was not included in Kurtz's final memorandum; and (3) a series of FBI surveillance tapes of Nicodemo Scarfo's Florida home from January 1986, which do not list Pelullo as a visitor to the residence.

Prior to the fourth trial, Pelullo filed a motion pursuant to 28 U.S.C. § 2255 to reverse his conviction on Count 54 and to dismiss the indictment due to the government's alleged Brady violations. The district court did not rule on that motion until after the conclusion of the fourth trial. In a post-trial ruling, the district court denied Pelullo's § 2255 motion on the ground that the government had not violated its Brady obligations. See United States v. Pelullo, 895 F. Supp. 718, 738 (E.D. Pa. 1995) ("Pelullo III").

Obviously this protracted litigation, with its wide audience (four juries and two prior appellate panels), has given rise to more than we have set forth above in terms of procedural and factual matters. But our purpose here is to focus upon what we believe to be particularly relevant to what occurred in Pelullo's fourth and most recent trial.

                                   B.

At the fourth trial, Pelullo was convicted of 46 counts of wire fraud and one RICO count, Racketeering Act 60. The substance of the government's case against Pelullo during the fourth trial, including the allegations contained in the Racketeering Act 60 charge in particular, was largely indistinguishable from that of his three earlier trials. In

6

fact, the only noteworthy difference was that at the conclusion

of its case-in-chief in the fourth trial, the government

introduced portions of Pelullo's testimony from his first trial.

 With respect to Racketeering Act 60, the government admitted the

following testimony from the first trial:

Q: First of all, did you ever have any contact with Mr. Leonetti?

A: I have knowledge of who Mr. Leonetti is.  I grew up in South Philadelphia.  I know these people from seeing them on the street and maybe running into them at a restaurant.  Do I know them well.  Do I associate with them?  No.

* * *

Q: Do you know a man named Nicodemo Scarfo?

A: I know who he is.  I know him from South Philadelphia.  I could have run into him at a restaurant.  I know who he is.

* * *

Q:       Okay.  Have you ever been to his home?

A:       Yes.

Q:       How did that come about?

A: What happened was I was in Miami and a man called me by the name of Sam LaRusso.  Sam had worked for my father about 30 years ago as a laborer.  And he told me he had a job in Fort Lauderdale, would I come up and help him?  I said sure, Sam, I'll be up to see it.

I went up to Fort Lauderdale and when I get there he tells me where I'm at.  I didn't know it was Scarfo's house.  And he said Leonard, he said, I need some help here.  There's a construction job.  I don't have any people here and I need to get a permit.  I said, Sam, I don't want to get involved.  Don't put me in this position.

7

And I wasn't threatened, but the situation with Sam was that Sam was a prisoner, basically, until this work was done and he asked me to get him a permit, get him some contractors to get the work done, otherwise he was going to have problem with these people. And I looked at the job. I sent Kent Swenson there and I said see what you can do about getting him a permit and get him some plans and get the job done and let's get the hell out of here. That's what I told him.

Q: Is that the only time you were ever at his house?

A: I might have been there twice with Sam, because he needed some technical help on how to do something and I tried to limit my exposure there, yes.

See Government's Motion for the Admission of Leonard A. Pelullo's Prior Statements, Supp. App. at 1450-52.

This, in essence, was the nature of the government's case against Pelullo in his fourth trial, and with this in mind we will address the issues he raises in this appeal.

## II.

Although Pelullo raises a series of claims on appeal,[1] we will focus upon the following four:

---

1. In addition to the four issues discussed in detail in Part II of our opinion, Pelullo also raises the following four claims: (1) that the district court committed two evidentiary errors by admitting alleged hearsay testimony and excluding the testimony of Peter Pelullo, Sr.; (2) that the prosecutor's rebuttal summation constituted plain error, denying Pelullo a fair trial; (3) that the fine imposed by the district court was plain error; and (4) that the district court improperly ordered the forfeiture of Pelullo's Montana ranch.

First, we do not believe that the district court abused its discretion in admitting certain testimony or in limiting the scope of Peter Pelullo, Sr.'s testimony. Second, in our view, the prosecutor's statements with respect to whether certain government witnesses would lie, although troublesome, did not rise to the level of plain error. Third, we believe the court acted in accordance with 18 U.S.C. § 1963(a), which provides that

(1)     that due to the government's <u>Brady</u> violation
        he is entitled to collateral relief on his
        Count 54 conviction from his first trial;

(2)     that he was forced to take the stand at his
        first trial because of the government's <u>Brady</u>
        violation and, therefore, the government's
        reliance in this case upon the testimony from
        that trial requires a reversal of his
        convictions;

(3)     that his right to a fair and impartial jury
        was violated because of a juror's failure
        honestly to answer certain questions during
        voir dire;

(4)     that the district court improperly increased
        Pelullo's sentence following his conviction
        at the fourth trial.


A.

Pelullo claims that the district court erred under 28

U.S.C. § 2255 when it denied his claim for collateral relief from

his conviction at his first trial on Count 54.[2]  More

specifically, he argues that this guilty verdict should be set

(..continued)
"a defendant who derives profits or other proceeds from an
offense may be fined not more that twice the gross profits or
other proceeds," when it imposed a $3.48 million fine.  <u>See</u> Supp.
App. at 1365 ("We [the defense] have indicated and the Government
agrees, that the jury convicted of a fraud involving
$1.74 million . . . . ").  Fourth, because the Montana ranch fell
within the scope of Pelullo's property identified in the
indictment, the district court's forfeiture ruling was consistent
with the requirements of Rule 7(c)(2) of the Federal Rules of
Criminal Procedure.

2.   Section 2255 states in relevant part that:

    [a] prisoner . . . under sentence of a court
        established by Act of Congress claiming the
        right to be released upon the ground that the
        sentence was imposed in violation of the
        Constitution or laws of the United States,
        . . . may move the court which imposed the
        sentence to vacate, set aside or correct the
        sentence. . . .

9

aside because of the government's alleged <u>Brady</u> violation -- its failure to turn over prior to his first trial the three pieces of impeachment evidence discussed earlier. See <u>United States v. Biberfeld</u>, 957 F.2d 98, 103 (3d Cir. 1992) (recognizing that <u>Brady</u> violations fall within the scope of 28 U.S.C. § 2255); <u>see also</u> <u>Lesko v. Owens</u>, 881 F.2d 44, 50 (3d Cir. 1990) ("Whether an error reaches the magnitude of a constitutional violation is an issue of law, subject to plenary review."), <u>cert</u>. <u>denied</u>, 493 U.S. 1036 (1990). Pelullo contends that the government's suppression of this information rendered the guilty verdict in his first trial on Count 54 unworthy of confidence. See <u>Kyles v. Whitley</u>, 115 S. Ct. 1555, 1566 (1995) ("The question [under <u>Brady</u>] is not whether the defendant would more likely than not have received a different verdict with the [suppressed] evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."). In deciding whether Pelullo is entitled to collateral relief from this conviction, we must consider the following two questions: first, did the government fail to provide the defense with potential impeachment evidence, specifically, the rough notes of Agents Wolverton and Kurtz, as well as various FBI surveillance tapes?; and second, if so, did the suppression of the evidence create a reasonable probability that a different result would have occurred at Pelullo's first trial on Count 54 had it been provided to the defense, thus rendering the violation a material one? See <u>Brady</u>, 373 U.S. at 87 ("[T]he suppression by the prosecution of evidence favorable to an accused . . . violates

due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."); see also United States v. Bagley, 473 U.S. 667, 678 (1985) (noting that "suppression of [Brady] evidence amounts to a constitutional violation only if it deprives the defendant of a fair trial"); Kyles, 115 S. Ct. at 1566 (defining a "fair trial" as one in which the verdict is worthy of confidence).

1.

We have no hesitation in concluding that the government inexplicably failed to abide by its obligation under Brady to disclose potential impeachment evidence. See, e.g., United States v. Ramos, 27 F.3d 65 (3d Cir. 1994) (recognizing that rough notes often may constitute valuable Brady material); United States v. Alvarez, 86 F.3d 901 (9th Cir. 1996) (same). As noted earlier, Pelullo argues that the withheld evidence clearly could have been utilized by the defense during his first trial to undermine the government's case on Count 54 by way of impeaching the testimony of three government witness: Leonetti, Wolverton and Kurtz. We agree. See Bagley, 473 U.S. at 676 ("Impeachment evidence . . . as well as exculpatory evidence, falls within the Brady rule."). For example, the defense could have seized upon the notation "repaying an intercompany debt," which appeared in Wolverton's rough notes but not in his final FBI 302, to question the credibility of Wolverton's testimony that Pelullo admitted in his interview that he had used $114,000 to pay-off a debt owed to DiSalvo. Similarly, the reference to "Summer 1986" in Agent Kurtz's rough notes of his interview with Leonetti, which was not

11

included in his report, arguably supported Pelullo's claim that the loan to DiSalvo was not paid-off until August or September of 1986, instead of February 1986 as the Government contended at trial. Finally, in theory, the FBI's surveillance tapes, which do not include any mention of Pelullo, could have undermined the credibility of Leonetti's claim that he met with Pelullo at Scarfo's Florida home sometime in January 1986 to discuss repayment of the DiSalvo loan.[3] Clearly, therefore, whether considered separately or collectively, these three items had potential impeachment value to the defense and, thus, constituted Brady evidence. As such, the government had an affirmative duty, which in this case it ignored, to provide this information to the defense.

2.

The question whether the nondisclosure of potential impeachment evidence was "material," however, requires a very different and more in-depth analysis. See Bagley, 473 U.S. at 682 ("The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."). The Supreme Court has cautioned that in making a Brady materiality determination, the focus should be upon an evaluation of whether

_____

3. In reality, the impeachment value of the FBI surveillance reports of Scarfo's home was questionable, because "no surveillance was conducted January 1, 3, and 5-21." Pelullo III, 895 F. Supp. at 738. In other words, the tapes only covered twelve days during the month of January, 1986. As such, they would likely do little, if any, to undermine Leonetti's testimony that he met with Pelullo at Scarfo's residence during that month to discuss repayment of the DiSalvo loan.

12

the suppression of the evidence, when viewed collectively, resulted in a verdict unworthy of confidence. See Kyles, 115 S. Ct. at 1567 (noting that the materiality of "suppressed evidence [is to be] considered collectively, not item-by-item"). Essentially, therefore, the question we must resolve is: when viewed as a whole and in light of the substance of the prosecution's case, did the government's failure to provide three pieces of Brady impeachment evidence to the defense prior to the first trial lead to an untrustworthy guilty verdict in that case on Count 54?

3.

We do not question that Pelullo's defense to Count 54 during his first trial would have been more compelling had it included the items of impeachment evidence at issue. Pelullo's defense to Count 54 was that he had used the money transferred in February to pay-off an intercompany debt and that he had not payed-off the DiSalvo loan until August or September. Pelullo's defense was contradicted at trial only by the testimony of three pivotal government witnesses: IRS Agent Kurtz, FBI Agent Wolverton and reputed mob underboss Leonetti. Indeed, this testimony was the linchpin of the government's case against Pelullo on that count.

As noted earlier, each piece of withheld evidence could have been used by the defense to undermine the credibility of Wolverton's, Kurtz's and Leonetti's testimony and formal reports. Because the credibility of the government witnesses was so central to the government's case, the jury very well could have

13

reached a different verdict had Pelullo been armed with this impeachment evidence.

Moreover, the result of Pelullo's third trial indicates that the result of his first trial may have been different had the evidence been turned over. At the third trial, when the evidence had finally been turned over to the defense, the jury failed to convict Pelullo on Racketeering Act 60, which charged the identical conduct as Count 54. Of course, we cannot know for certain why a jury would be unable to reach a verdict, but at the very least, the result of the third trial suggests that some members of the jury may have been swayed by the impeachment evidence.[4] As such, we cannot say that the guilty verdict on Count 54 in the first trial is worthy of confidence. See Bagley, 473 U.S. at 678 (holding that a conviction must be reversed "if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial") (citation omitted). Accordingly, because we find that the withheld evidence was both favorable to the defense and material, we

_____

4. The government contends that because Pelullo had the alleged Brady material before the fourth trial and was nevertheless convicted of Racketeering Act 60, the withheld evidence would not have made a difference in the first trial. As discussed earlier, however, the defendant does not have to prove that he would not have been convicted had the government complied with its Brady obligations. Rather, it is enough that confidence in the verdict is undermined. See Kyles, 115 S. Ct. at 1566. While we do not find the results of either the third or the fourth trial to be dispositive on the issue of materiality, the jury's failure to reach a verdict in the third trial bolsters our conclusion that the verdict in the first trial is untrustworthy. Moreover, the conviction in the fourth trial does little to instill confidence in the Count 54 conviction because in that trial the government introduced Pelullo's testimony from the first trial, which it had not done in the third trial.

14

reverse the district court's denial of Pelullo's motion for collateral relief under 28 U.S.C. § 2255 and remand for a new trial on Count 54.

B.

Pelullo also claims that the district court erred by allowing the government to introduce his testimony from the first trial during its case-in-chief in the fourth trial. According to Pelullo, this testimony should not have been allowed because he was forced to take the stand at the first trial due solely to the government's failure to abide by its obligation under Brady. In other words, Pelullo argues that because he had no other way to impeach the government witness, he was compelled to take the stand himself and rebut their testimony. Thus, he contends that all of his convictions at his fourth trial were tainted and, therefore, should be reversed.

In support of his argument, Pelullo relies primarily upon Harrison v. United States, 392 U.S. 219 (1968). There, the Supreme Court held that a defendant's testimony, given after the government had introduced what was later determined to have constituted a series of illegally obtained confessions, could not be used against that same defendant in a subsequent proceeding. Because Pelullo cites Harrison as the chief source of support for his position, we will begin our discussion with an analysis of that case.

Harrison had been charged with felony murder and at trial took the stand in his own defense. In the wake of his testimony, which was at variance with three confessions that

15

previously had been introduced by the government during its case-in-chief, the jury returned a guilty verdict.[5]  On appeal, the D.C. Circuit reversed Harrison's conviction and remanded the case for a new trial on the ground that the three confessions had been illegally obtained, a clear violation of his Fifth Amendment right against self-incrimination, and were therefore inadmissible.  During the second trial, however, the prosecution was allowed to introduce the substance of Harrison's testimony from his first trial.  Once again, the jury returned a guilty verdict.

In reversing Harrison's conviction, the Supreme Court held that his testimony at his original trial was the "inadmissible fruit of the illegally procured confessions" and, thus, should not have been presented to the jury during his second trial.  See Harrison, 392 U.S. at 223 (noting that because Harrison apparently took the stand "to overcome the impact of confessions illegally obtained and hence improperly introduced, then his testimony was tainted by the same illegality that

_____

5.    In contrasting the substance of the three confessions and Harrison's own testimony, the Supreme Court stated :

> The substance of the confessions was that the petitioner and two others, armed with a shotgun, had gone to the victim's house intending to rob him, and that the victim had been killed while resisting their entry into his home.  In his testimony at trial the petitioner said that he and his companions had gone to the victim's home hoping to pawn the shotgun, and that the victim was accidently killed while the petitioner was presenting the gun to him for inspection.

Harrison, 392 U.S. at 221.

16

rendered the confessions themselves inadmissible").  According to

Pelullo, his decision to take the stand at his first trial was

impelled by the government's unlawful withholding of vital

impeachment evidence.  In other words, Pelullo claims that his

testimony at his first trial, like Harrison's, constitutes the

inadmissible fruit of a poisonous tree.

As a general rule, a defendant's testimony at a former

trial is admissible in subsequent trials.  See Harrison, 392 U.S.

at 322.  When a defendant's testimony is compelled, however, by a

constitutional violation, that testimony must be excluded from

subsequent proceedings.[6]  Thus, a court must determine:

(1) whether there was a constitutional violation; and (2) whether

the defendant would have testified anyway even if there had been

no constitutional violation.  The burden of proving that the

defendant would have testified had the government not committed

---

6.    Seventeen years after Harrison, in Oregon v. Elstad, 470
U.S. 298 (1985), the Supreme Court held that only coerced
confessions violate the Fifth Amendment.  Today, it is unclear
whether the government's reliance upon Harrison's illegally
obtained (but not coerced) confessions would rise to the level of
a constitutional violation.  See Yale Kamisar, On the "Fruits" of
Miranda Violations, Coerced Confessions, and Compelled Testimony,
93 MICH. L. REV. 929, 998 (1995) (noting that "considering the
case's particular facts, it must be said that Harrison would
probably be decided differently today . . . [because] the
poisonous tree in Harrison consisted on merely McNabb-Mallory
violations, not coerced confessions, and in Elstad the Court
indicated that nowadays the poisonous tree doctrine only applies
to evidence stemming from constitutional violations").

In any event, regardless of whether Elstad can be read to
modify Harrison to apply only to evidence stemming from
constitutional violations, we see no reason to limit the
application of Harrison in this case.  Here, the government's
failure to abide by its Brady obligations resulted in a
constitutional violation.

17

the violation lies with the government. See id. at 225 ("Having `released the spring' by using the petitioner's unlawfully obtained confessions against him, the Government must show that its illegal action did not induce his testimony.") (citation omitted).

We have already determined that the government violated Pelullo's right to a fair trial on Count 54 by withholding Brady material prior to the first trial. Thus, the first prong of the Harrison analysis has been satisfied. We decline to determine, however, whether Pelullo would have testified in the first trial anyway even if the government had complied with its Brady obligations. Instead, for the reasons that follow, we will remand to the district court to make this determination.

1.

Generally, we will review a district court's evidentiary rulings for abuse of discretion. See United States v. Himelwright, 42 F.3d 777, 1781 (3d Cir. 1994) (citing United States v. Sampson, 980 F.2d 883, 886 (3d Cir. 1992). When, however, a district court's ruling is based on an interpretation of law, our review is plenary. See United States v. Sokolow, 91 F.3d 396, 402 (3d Cir. 1996).

At the conclusion of Pelullo's fourth trial, the district court held an evidentiary hearing to determine whether Pelullo's testimony from the first trial had been improperly admitted. See Pelullo III, 895 F. Supp. 718 (E.D. Pa. 1995). The district court rejected Pelullo's contention that his decision to testify at the first trial was impelled by the

18

government's Brady violation. See id. at 740. There are two problems with the district court's conclusion. First, the district court's conclusion was driven largely by its determination that the evidence did not constitute Brady material. See id. Under the district court's analysis, because there was no Brady violation, Pelullo's testimony could not logically be said to have been "impelled" by that Brady violation. Although not explicitly stated, the district court seems to have concluded that because the withheld evidence was insubstantial -- that its suppression did not affect the fairness of the Count 54 verdict -- by the same token, the evidence could not have been so fundamental to Pelullo's case that he would not have testified had the evidence been properly turned over. However, we have reversed the district court's holding on the Brady issue. It follows that we cannot defer to the district court's holding on the Harrison issue.

Second, the district court concluded that Pelullo would have taken the stand even if the withheld evidence was material and had been provided to the defense prior to the first trial. See id. In reaching this conclusion, however, the district court misallocated the burden under Harrison. Harrison makes clear that the burden of proof lies with the government to show that the defendant would have testified anyway absent the constitutional violation. See Harrison, 392 U.S. at 225. In rejecting Pelullo's argument for a new trial, the district court stated that "Defendant offers no explanation as to why he would not have testified had he been in possession of these materials."

Pelullo III, 895 F. Supp. at 740.  By imposing the burden on Pelullo, the district court committed error.

Accordingly, because the district court's conclusion on the Harrison issue was based on its finding that no Brady violation had been committed, and because the district court misallocated the burden of proof under Harrison, we vacate the district court's denial of Pelullo's Rule 33 motion for a new trial and remand for a new hearing on that motion consistent with this opinion.  On remand, the government should be afforded an opportunity to demonstrate, consistent with its burden of proof, that Pelullo would have testified during his first trial even if the withheld material had been turned over.

C.

Next, Pelullo claims that he is entitled to a new trial due to the misconduct of one of the jurors during his fourth trial.  According to Pelullo, after his conviction he became aware that Juror #229 had not honestly answered a series of questions during voir dire.  Pelullo alleged that this juror failed truthfully to respond to the following questions:

(1)     Is any juror related to or closely associated with anyone employed by any law enforcement agency, including the FBI, local police?

(2)     Has any juror ever been related to or associated or connected with anyone who was involved in the defense of a criminal case? Whether as a witness, party or as an attorney who defended the matter?

(3)     Has any juror, relative or close friend ever been charged with a crime in any court, state, local or federal?

20

See Appellant's Br. at 30.  As a result, Pelullo filed a motion under Fed. R. Crim. Proc. 33, seeking a new trial.[7]  Due to the vague and generally conclusive nature of the motion, the district court decided to hold a hearing to determine whether this alleged misconduct was discovered during or after the trial.

In general, once a verdict has been reached courts are reluctant to recall jurors to determine whether misconduct has occurred.  See United States v. Gilsenan, 949 F.2d 90, 97 (3d Cir. 1991).  Thus, to prevail on a Rule 33 motion based upon juror misconduct, a defendant must establish as a preliminary matter that:  "(1) the evidence is newly discovered, in other words, that it has been discovered since the end of the trial and (2) that the defendant's failure to discover this information during trial is not the result of a lack of diligence."  United States v. Bolinger, 837 F.2d 436, 438-39 (11th Cir. 1989); see also United States v. McKinney, 952 F.2d 333 (9th Cir. 1991)

7.    Rule 33 of the Federal Rules of Criminal Procedure provides that:

> The court on motion of a defendant may grant a new trial to that defendant if required in the interest of justice.  If trial was by the court without a jury the court on motion of a defendant for a new trial may vacate the judgment if entered, take additional testimony and direct entry of a new judgment.  A motion for a new trial based on the ground of newly discovered evidence may be made only before or within two years after final judgment, but if an appeal is pending the court may grant the motion only on remand of the case.  A motion for a new trial based on any other grounds shall be made within 7 days after verdict or finding of guilty or within such further time as the court may fix during the 7-day period.

("[A] defendant cannot learn of juror misconduct during the trial, gamble on a favorable verdict by remaining silent, and then complain in a post-verdict motion that the verdict was prejudicially influenced by that misconduct.").

During the course of the evidentiary hearing, which lasted three days, the trial court heard testimony from a variety of witnesses, including a Ms. Mitchell, the individual who allegedly initially learned of the misconduct of Juror #229. At the time of the hearings, Ms. Mitchell had been employed by Pelullo's father for more than a year at his wholesale food store, Montco Cash and Carry. In commenting upon Ms. Mitchell's testimony, the court observed that:

> [d]espite the new found information that the Juror had a sister who was the victim of a violent crime, smoked marijuana every day prior to trial and had a brother-in-law who was convicted of a crime, Ms. Mitchell did not disclose this information to Defendant's father. Ms. Mitchell is not sure whether she ever disclosed this information to Defendant's father. In fact, Ms. Mitchell is not very sure when or to whom she disclosed this information about the Juror. All Ms. Mitchell remembers is that she revealed this information to Neil Eggleston, one of Defendant's attorneys, sometime between mid-February and mid-March. Ms Mitchell claims that she found Mr. Eggleston's name in the Rolodex at work and decided to call him without being instructed to do so by anyone.

Pelullo III, 895 F. Supp. at 725 (citations omitted). The district court ultimately rejected as incredible the testimony of Ms. Mitchell, choosing instead to credit the testimony of James Grimes, James Donahue and John Micofsky. See id. at 727-30. Relying largely upon the statements of Messrs. Grimes, Donahue

22

and Micofsky, the court concluded that there was sufficient evidence from which to infer that Pelullo or, perhaps, his counsel had knowledge of the juror's alleged misconduct prior to the end of the trial. See id. at 729-31. Accordingly, the court denied Pelullo's Rule 33 motion for a new trial. Id. at 730.

In our view, there was adequate factual evidence presented during the hearing to support the district court's finding.[8] See Anderson v. Bessemer City, 470 U.S. 564, 575 (noting that "when a trial judge's finding is based on his decision to credit the testimony of one or two witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error"). As such, we will affirm the district court's denial of Pelullo's Rule 33 motion for a new trial based on juror misconduct.

D.

Finally, Pelullo contends the district court erred by imposing a sentence for his conviction on Count 54 that was longer than the sentence he had received earlier for the same count. Because we will reverse Pelullo's conviction on Count 54, we need not address Pelullo's sentencing argument.

---

8.    An in-depth discussion of the substance of the three day hearing is set forth in the district court's opinion. Pelullo III, 895 F. Supp. at 723-30.

23

For the foregoing reasons, we will reverse the district court's order on the § 2255 motion and remand for a new trial on Count 54.  We will also reverse the district court's order on the Rule 33 motion and remand for a new hearing.  We will affirm the district court's order in all other respects.