**UNITED STATES of America,**

v.

**Leonard PELULLO.**

**No. CR. 91–60.**

United States District Court,
E.D. Pennsylvania.

April 26, 2001.

1858, 29 L.Ed.2d 363 (1971).

## MEMORANDUM

ROBERT F. KELLY, District Judge.

Presently before the Court is Leonard A. Pelullo's ("Pelullo") Petition under 28 U.S.C. § 2255 challenging his 1995 convictions.

## PARTIAL HISTORY[1]

In February 1991, the Grand Jury returned a multi count indictment against

---

**1.** I believe the partial history is sufficient in order to deal with the present Petition. Any additional history can be found at the following locations: *U.S. v. Pelullo*, 1992 WL 245915 (E.D.Pa. Sept. 16, 1992); *U.S. v. Pelullo*, 1993 WL 30069 (E.D.Pa. Feb. 6, 1993); *U.S. v. Pelullo*, 1993 WL 88288 (E.D.Pa. Mar. 26, 1993); *U.S. v. Pelullo*, 1993 WL 216127

Pelullo charging him with wire fraud and racketeering. The Indictment averred that Pelullo had conducted several fraudulent schemes to divert corporate funds to his personal use. The fraudulent diversions included a February 25, 1986 wire transfer of $114,000 from a corporate bank account to the Palm Beach Heights Development Corporation ("PBH") to a bank account in Philadelphia controlled by Pelullo. The fraudulent wire transfer was charged as a wire fraud violation (Count 54) and a racketeering act ("RA 60") in the racketeering count (Count 55).

At trial, in June of 1991, the Government's evidence established that Pelullo had diverted the $114,000 from the PBH account to repay a personal debt he owed to Anthony DiSalvo, a loan shark associated with the Philadelphia Mafia. The Government's evidence showed that Pelullo had met with Nicodemo Scarfo and Phillip Leonetti, members of the Philadelphia Mafia at Scarfo's residence in Florida to discuss repayment of the debt Pelullo owed to the loan shark. According to Leonetti, who testified for the Government, this meeting occurred after Christmas Day of 1985, but before a date in the early part of January 1986 when Scarfo and Leonetti returned to Philadelphia. The Jury convicted Pelullo of Count 54 and Count 55, finding that RA 60 had been established. On appeal, the United States Court of Appeals affirmed the conviction on Count 54, but vacated the conviction on Count 55 and ordered a new trial. *See United States v. Pelullo*, 964 F.2d 193 (3d Cir. 1992).

In October 1994, the Government produced to Pelullo copies of surveillance logs of physical surveillance conducted at Scarfo's Florida residence for the period January 1 through January 31, 1986. (Defense Exhibit No. 1). The Government also disclosed that surveillance had been conducted at Scarfo's residence on December 27, 28 and 29, 1985. (Defense Exhibit No. 2). Following a retrial in January 1995, a jury convicted Pelullo of Count 55, finding that RA 60 had been established, and multiple wire fraud counts. The Third Circuit Court of Appeals affirmed these convictions. *See United States v. Pelullo*, 173 F.3d 131 (1999). Pelullo filed a prior petition under 28 U.S.C. § 2255 alleging that Count 54 should be vacated because the Government had failed to produce three pieces of evidence, including the surveillance logs, which the Government turned over to him in October 1994, which constituted exculpatory evidence under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) that should have been turned over to him before the 1991 trial. The Third Circuit vacated the conviction on Count 54. *See United States v. Pelullo*, 105 F.3d 117 (1997).

## PELULLO'S JANUARY 21, 1998 § 2255 PETITION

This present petition challenges the 1995 convictions. The hearing on this petition was delayed because Pelullo was in federal custody in the state of Florida awaiting trial on a separate federal criminal indictment. Pelullo, and his counsel, requested that the hearing be continued until such time as he could be present. Because this

(E.D.Pa. June 18, 1993); *U.S. v. Pelullo*, 1993 WL 418358 (E.D.Pa. Oct. 15, 1993); *U.S. v. Pelullo*, 1994 WL 236481 (E.D.Pa. May 17, 1994); *U.S. v. Pelullo*, 895 F.Supp. 718 (E.D.Pa. Aug. 8, 1995); *U.S. v. Pelullo*, 1996 WL 257345 (E.D.Pa., May 10, 1996); *U.S. v. Pelullo*, 6 F.Supp.2d 403 (E.D.Pa. June 9, 1998); *U.S. v. Pelullo*, 964 F.2d 193 (3d Cir. 1992), *reh'g denied*, (14 F.3d 881 (3d Cir. 1994)); *U.S. v. Pelullo*, 14 F.3d 881 (3d Cir. 1994) *reh'g and reh'g in banc denied* (14 F.3d 881 (3d Cir.1994)); *U.S. v. Pelullo*, 105 F.3d 117 (3d Cir.1997); *U.S. v. Pelullo*, 173 F.3d 131 (3d Cir.1999); *U.S. v. Pelullo*, 178 F.3d 196 (3d Cir.1999); *Pelullo v. U.S.*, 528 U.S. 824, 120 S.Ct. 72, 145 L.Ed.2d 62 (1999).

Court is aware that Mr. Pelullo has always taken an active part in his various court proceedings, I agreed. When Pelullo finally became available, this Court, after consultation with the attorneys, scheduled a hearing for August 24, 2000.

On August 11, 2000, Pelullo filed a motion seeking court-authorized discovery in connection with his § 2255 Petition, which at that point had been pending for thirty-two (32) months. He also requested an indefinite continuance of the hearing scheduled for August 24, 2000 so that he could search for additional surveillance material. On August 22, 2000, this Court denied Pelullo's motion for discovery and a continuance. At the August 24, 2000 hearing, counsel for Pelullo called Stephen Bertucelli to testify regarding the issue of surveillance of Scarfo's residence and produced exhibits relating to that issue. Although Pelullo was present at the hearing, he did not testify.

The Petition alleged that the Government failed to produce the following items: (a) surveillance records of Scarfo's residence; (b) an FBI Form 302 Report by Special Agent Gary Scalf ("the Scalf Report"); (c) information about Government payments to Leonetti; and (d) 37 additional pieces of evidence. Pelullo alleged that each of these items constituted *Brady* material. *See* Petition at 5–7.

On March 26, 1998, the Government filed its response to Pelullo's Petition opposing his contention that the Government had failed to produce *Brady* material. At the conclusion of the August 24, 2000 hearing, Pelullo withdrew his contention that the Government had failed to produce 37 additional items of alleged *Brady* material. (Tr. at 96). Pelullo also acknowledged that he was not pursuing the claims that the Government had failed to produce the Scalf report and the information regarding payments to Leonetti. *Id.* Pelullo's counsel also acknowledged that his *Brady* claim was limited to specific items: an FBI Form 302 Report prepared by Special Agent Richard McKeen and a surveillance report prepared by Pennsylvania State Trooper Joseph P. Moran. Pelullo also asserted that any surveillance records revealed by these reports, which had not been produced, would also constitute *Brady* evidence.

## PELULLO HAS FAILED TO ESTABLISH THAT HE DID NOT POSSESS THE McKEEN AND MORAN REPORTS PRIOR TO OR DURING THE 1995 TRIAL.

At the evidentiary hearing, Pelullo failed to offer any evidence as to when he received those reports. At that hearing, the Court asked the following question:

THE COURT: When did you get Moran's report? Do you know the date?

MR. WERBEL: I do not have the date, Your Honor. My understanding is that it was at some point this year, earlier this year we received Agent Moran's report from another attorney that had been given it from the U.S. Attorney in their case.

THE COURT: Okay. And the other, McKeen?

MR. WERBEL: The McKeen report was part of our original Section 2255 that was filed, and we've had that, and that was also Your Honor from another attorney that received it from a different U.S. Attorney in a different matter.

The only other references to this issue were the following:

Pelullo's counsel represented at the hearing that the Moran report was received on January 28, 2000, from a defense attorney in another matter. (Tr. at 81–82);

Pelullo's counsel represented in his Proposed Findings of Fact that Pelullo re-

ceived the Moran report from another defense attorney in January of 2000; Pelullo's counsel represented in his Proposed Findings of Fact that Pelullo received the McKeen report from Robert Simone but does not state when he received it.

■ This is a uniquely important issue in this case because we know that counsel for Pelullo has represented that Pelullo obtained the McKeen report from Robert Simone. This is the same source from whom Pelullo obtained the Kurtz memorandum, a document that was part of the basis for Pelullo's first Section 2255 Petition. On March 8, 1993, Pelullo filed a Motion for a New Trial based on newly discovered evidence, in which Pelullo's counsel stated: "he obtained the [Kurtz] memorandum from the defense in the case of *United States v. Simone and DiSalvo* sometime during the second [Pelullo] trial." Motion at 4. Since Pelullo obtained discovery material relating to the government's proof of the DiSalvo transaction from Simone in January of 1993, and since Pelullo has represented that he obtained the McKeen report from the same source but without specifying when he received it, the reasonable inference is that Pelullo could have obtained the McKeen report from Simone as early as January 1993. It is crucial to Pelullo's claim that he establish that he did not possess this material prior to or during the 1995 trial, and he has failed to do so. In the reply to the Government's position on this point, Pelullo's counsel attempted to remedy this failure by introducing arguments of counsel about the circumstances of how and when Pelullo obtained these materials. *See* Reply at 12–13. I find that arguments of counsel in a legal memorandum do not constitute competent legal evidence.

The Moran report was prepared by a Pennsylvania State Trooper from his own observations and from reports in the custody of the Metropolitan Organized Crime Intelligence Unit ("MOCIU"). I have reviewed the Moran report (Defense Exhibit 3) and compared it to the surveillance logs and disclosures made to Pelullo during the 1995 trial (Defense Exhibit 1, 2). I find that the Moran report is a partial summary of the much more detailed information contained in the disclosures made to Pelullo before the 1995 trial. The Moran report does not identify any surveillances or results of surveillances that were not disclosed to Pelullo before the 1995 trial.

I find that Pelullo has failed to establish that the McKeen report and the Moran report were suppressed within the meaning of *Brady v. Maryland,* and has, therefore, failed to establish a *Brady* violation. I find also that Pelullo has failed to establish that the Moran report was a document within the possession or control of the Government, subject to disclosure under *Brady.* Trooper Moran was a Pennsylvania State Trooper. His report indicates that he was participating in the surveillance of the Scarfo house in connection with a separate investigation of Joseph Pungitore. *See* Defense Exhibit 3, at 1. The McKeen report identifies the agencies participating in the surveillance, but does not identify the Pennsylvania State Police as one of the participating agencies. *See* Defense Exhibit 4, at 1. There has been no evidence produced showing that the Moran report was in the possession and control of the Government. The Court finds, therefore, that Pelullo has failed to establish that the Moran report was a document within the possession and control of the Government or any agency participating in the investigation.

## PELULLO HAS FAILED TO ESTABLISH THAT THE McKEEN AND MORAN REPORTS WERE MATERIAL TO HIS DEFENSE.

■ In October of 1994, the Government produced surveillance logs of Scarfo's

residence that covered the period from January 2, 1986 through January 31, 1986. (Defense Exhibit 1). In addition, the Government disclosed that surveillances were conducted of Scarfo's house on December 27, 28, and 29, 1985 (Defense Exhibit 2). I have reviewed the surveillance records designated Defense Exhibit 1, and I note that of the persons observed on the dates of January 2, 4, and 5, 1986, there are dozens with the notation "WM", which means "white male," seen arriving or leaving the residence. Some notations indicate that a photograph was taken. I made a rough count of the unidentified white males arriving during the surveillance of January 4, 1986. From that count, I would say that there were at least 40 unidentified white males seen arriving or talking at those premises. This figure does not include unidentified white males who arrived in automobiles where the license numbers were recorded, nor does it include notations of unidentified white males leaving the premises. In reviewing this surveillance log for January 2, 1986, I note that during the relatively short period that it was conducted, five unidentified white males arrived in vehicles where the license numbers were not recorded, and two other vehicles arrived where the license numbers were recorded but each vehicle contained three unidentified white males. The license numbers of those vehicles might lead to the identification of one of the males in each car, but not to the other four. Therefore, in that short period of time, nine unidentified white males arrived at the Scarfo residence.

A review of the surveillance logs for this period also reveals that surveillances were not conducted every day, and on days when surveillance was conducted, it was not conducted for the entire day and night. I also note that vehicle license numbers were often not recorded and the photographing of people entering and leaving the Scarfo residence was the exception rather than the rule.

Pelullo contends that the surveillance records were material to his defense because they would conclusively establish that he was not present at Scarfo's residence at any time during the period December 26, 1985 through January 8, 1986 and, therefore, Leonetti must have lied when he testified that Pelullo met with Scarfo at this time to discuss the DiSalvo debt. It is plain from the above, that these records would not help establish that proposition. Any one of the unidentified white males could have been Pelullo. In any event, as has been stated before, the surveillance was not continuous.

The information in the Moran report is merely a partial summary of the more detailed information contained in the surveillance logs which were produced to Pelullo for the 1995 trial. (Defense Exhibits 1 and 2). Therefore, the Moran report would not constitute *Brady* material because the information contained in it had been given to Pelullo for the 1995 trial. (Defense Exhibit 1).

Pelullo contends that the Moran report constitutes *Brady* evidence because a statement in the report establishes that Trooper Moran received "surveillance records for each day between December 27, 1985 and January 5, 1986." (Proposed Findings at ¶ 48). Pelullo contends that Trooper Moran intentionally used the word "inclusive" in his report when he made the following statement:

"Surveillance records from 27 Dec 1985 through 5 Jan 1986 inclusive submitted by Officers of MOCIU."

Pelullo interprets Moran's use of the word "inclusive" to mean that there were surveillances of Pelullo's house every day during the period December 27, 1985 through January 5, 1986.

After reviewing Defense Exhibits 1 and 2, which are the surveillance records disclosed to Pelullo before the 1995 trial, I find that the only reasonable interpretation of Trooper Moran's use of the word "inclusive" is that he reviewed surveillance reports for the dates December 27, 28, and 29, 1985 and January 2, 4, and 5, 1986, and not to imply that there were surveillances at Scarfo's residence every day during this period. If Trooper Moran intended to give the word "inclusive" anything other than its ordinary meaning, Pelullo could have called Trooper Moran as a witness to testify to this fact at the hearing. He did not do so.

### STEVEN BERTUCELLI

■ Pelullo hired Mr. Bertucelli, a private investigator, to review the MOCIU surveillance records for December 1985 and January 1986. Bertucelli testified that he had access to those records and reviewed them. He testified that he did not ask for copies of the records and did not take any notes about the records during his review. He further testified that he was hired simply to determine whether such surveillance records existed and that he was not instructed to obtain copies. (Tr. 59, 68–69, 73). I do not believe when considering all of the facts surrounding this case that if material surveillance reports existed in the MOCIU records, Pelullo would not have directed Bertucelli to obtain them so that Pelullo could produce them at the hearing.

To the extent that Bertucelli's testimony is offered to establish the frequency and duration of the surveillance during December of 1985 and January of 1986, that testimony is based on hearsay, and was excluded. (Tr. 53–55).

### PELULLO'S TESTIMONY IN THE 1991 TRIAL

In his petition, Pelullo contends that he has "always denied that any meeting with Leonetti ever occurred." But he did not deny being at Scarfo's house on two occasions:

Q. Okay. Have you ever been to his [Scarfo's] home?

A. Yes.

Q. How did that come about?

A. What happened was I was in Miami and a man called me by the name of Sam LaRusso. Sam had worked for my father about 30 years ago as a laborer. And he told me he had a job in Fort Lauderdale, would I come up and help him? I said sure, Sam, I'll be up to see it.

I went up to Fort Lauderdale and when I get there he tells me where I'm at. I didn't know it was Scarfo's house. And he said Leonard, he said, I need some help here. There's a construction job. I don't have any people here and I need to get a permit. I said, Sam, I don't want to get involved. Don't put me in this position.

And I wasn't threatened, but the situation with Sam was that Sam was a prisoner, basically, until this work was done and he asked me to get him a permit, get him some contractors to get the work done, otherwise he was going to have a problem with these people. And I looked at the job. I sent Keith Swenson there and I said see what you can do about getting him a permit and get him some plans and get the job done and let's get the hell out of here. That's what I told him.

Q. Is that the only time that you were ever at his house?

A. I might have been there twice with Sam, because he needed some technical help on how to do something and I tried to limit my exposure there, yes.

Trial July 1, 1991, p. 200. Also in his closing argument at the first trial, then counsel for Mr. Leonetti argued:

> ... They bought in a man named Phillip Leonetti, in this case, to try to paint a picture of Leonard Pelullo having some contact with bad people. He's not charged with that. Mr. Leonetti talked about reaching out and putting pressure and muscle on Leonard Pelullo to repay a debt. He got victimized by an admitted ruthless murderer. And then he has been victimized by the Government by their bringing this man before you to try to make it appear that he, Mr. Pelullo is bad because he had some contact with these people, that he borrowed money and had to pay it back.

Trial July 2, 1991, p. 160.

As can be seen in his testimony during the first trial, Pelullo admitted being at Scarfo's house on two occasions. He testified that he went to Scarfo's house for a reason that was not related to the DiSalvo loan, but did not deny meeting Scarfo or Leonetti at the house. Neither the timing nor the fact of the meting between Leonetti and Pelullo were critical to convicting Pelullo on RA 60. The significance of Leonetti's testimony was to establish that Pelullo had a motive to divert corporate funds to his own use in order to repay the DiSalvo debt, and, in fact, the loan was repaid a few weeks after the February 25, 1986 wire transfer. The government established this motive by proving that Pelullo had an over due loan shark debt to DiSalvo and that Pelullo knew that Scarfo, the boss of the Philadelphia Mafia, and Leonetti, also a Mafia member, wanted him to repay that DiSalvo debt. It was not essential to the proof of the violation that Pelullo learned directly from Leonetti and Scarfo that they were going to enforce the loan. It was admitted by Pelullo himself that he learned this from his brother Peter. The fact that has never been disputed was that Pelullo knew that two powerful Mafia members were telling him to repay the loan. Pelullo's defense has never been a denial of the fact that he owed money to DiSalvo and was pressured by the Mafia to repay it. Therefore, contradicting the government's evidence that Pelullo met with Scarfo and Leonetti at Scarfo's residence in Florida in December 1985 or January 9, 1986 was not critical to Pelullo's defense.

## SUBSTANTIAL OTHER EVIDENCE

In addition to Leonetti's testimony, the government introduced substantial other evidence to prove that Pelullo used the $114,000 to repay the DiSalvo loan. Donald McDonald testified that Pelullo directed him to cash a corporate check for $114,000 on February 25, 1986, which the bank refused to do. Pelullo then directed McDonald to wire transfer $114,000 of corporate funds to a corporate account controlled by Pelullo's father. This testimony supported the urgency of Pelullo's immediate need for cash. Pelullo's brother, Arthur, testified that their father wrote several corporate checks payable to cash totaling $114,000, and directed Arthur to cash them. Arthur cashed the checks within a day or two of February 25, 1986. Arthur's testimony also suggested the urgency of Pelullo's need for cash. Leonetti testified that DiSalvo gave him $60,000, which Leonetti understood to be his share of the Pelullo loan repayment. The government also introduced Pelullo's statement to the F.B.I. that he admitted using the $114,000 to repay his debt to Di Salvo. Therefore, even if Pelullo had succeeded in identifying any surveillance records relating to Scarfo's residence, which the government had failed to produce before the 1995 trial, these records would not have rebutted the other

substantial evidence the government introduced to establish RA 60.

## JUDICIAL ESTOPPEL

■ Pelullo contends that the doctrine of judicial estoppel precludes the government from "arguing that the McKeen report does not describe continuous surveillance." Reply at 23. Pelullo contends that the government has taken the position with respect to the McKeen report that is inconsistent with the position taken by the Government in a separate criminal proceeding, *United States v. Simone*, No. 91–569, 1998 WL 54387 (E.D.Pa.), *aff'd*, 172 F.3d 42 (3d Cir.1998). According to Pelullo, the government took the position in *Simone*, that the McKeen report indicated that the government maintained "continuous surveillance" on Scarfo's residence during the period December 28, 1985 through February 11, 1986. Reply at 5. Pelullo contends in this case, that the government has taken an inconsistent position by asserting that the McKeen report does not describe continuous surveillance of Scarfo's resident during the period of December 28, 1985 through February 11, 1986.

Assuming that the doctrine of judicial estoppel could be applied against the government in a criminal case, I find that it would not apply to the facts of this case. The government's position in this case is not inconsistent with the position taken by the government in *Simone*. In *Simone*, the government provided the defendant with a copy of the McKeen report in pretrial discovery. Following his conviction, Simone contended in a Section 2255 petition that the government had suppressed evidence favorable to the defendant in violation of *Brady* because it did not produce the surveillance logs (which the government produced to Pelullo in this case). In response, the government asserted that

some of the surveillance information contained in the summary logs had been produced to the defendant in the McKeen report: "[T]he government disclosed some of the surveillance information, albeit in a different form." Government's Response to Petitioner Robert F. Simone's Motion to Vacate, etc., at 19. The government noted that the McKeen report described five of 13 days of surveillance conducted at Scarfo's residence in January 1986 described in the summary logs. *Id.* The government further noted that the McKeen report stated:

> "[S]urveillance was conducted during the period December 28, 1985 through February 11, 1986, thus putting petitioner on notice that surveillance exists. Therefore, petitioner could have obtained the additional surveillance information himself through the exercise of due diligence, and therefore, it was not suppressed by the government."

Therefore, the government's position in Simone was that the McKeen report indicated that more surveillance information was available than the specific dates of surveillance summarized in the McKeen report.

In the present case, the government contends that the surveillance logs, which were produced to Pelullo before the 1985 trial, contained more surveillance information than is contained in the McKeen report. Therefore, the government's position in this case is the same position taken by the government in *Simone:* the summary logs contained more surveillance information than is contained in the McKeen report. The government has not taken inconsistent positions with respect to the McKeen report which would be a necessary prerequisite for the application of the judicial estoppel doctrine. *See McCarron v. FDIC*, 111 F.3d 1089, 1097 (3d Cir.1997).

## LAW OF THE CASE DOCTRINE

] Pelullo contends that the prior decisions of the Third Circuit in this matter establish that the McKeen and Moran · reports constitute *Brady* material, because the Third Circuit has previously held that surveillance information contained in the surveillance logs constituted *Brady* evidence. Pelullo also contends that the Third Circuit has rejected the government's argument that the fact that unidentified persons were observed at Scarfo's residence undermines any impeachment value of the McKeen and the Moran reports.

] Under the law of the case doctrine, this Court is bound by the mandate of the Third Circuit. However, the law of the case doctrine applies only to matters actually decided by the prior decision. *See Coca–Cola Bottling Co. of Shreveport, Inc. v. Coca–Cola Co.*, 988 F.2d 414, 429–30 (3d Cir.1993). Following a remand for a new trial, the district court may address issues that were not decided by the Court of Appeals in its decision remanding the case. *See Cooper Distributing Company v. Amana Refrigeration, Inc.*, 180 F.3d 542, 548 (3d Cir.1999)(law of the case doctrine did not preclude district court from admitting evidence at retrial in support of plaintiff's damage theory which the appellate court did not address in its original opinion).

In this § 2255 petition, Pelullo contends that the McKeen report and the Moran report constitute *Brady* material that the government should have produced before the January 1995 trial. However, the Third Circuit has never addressed or decided whether the McKeen report or the Moran report should have been produced before the January 1995 trial. Nor has the Third Circuit addressed whether the suppression of these documents, assuming Pelullo could establish these documents

were suppressed within the meaning of *Brady*, constituted a due process violation under *Brady*.

In *Pelullo III*, the Third Circuit considered whether the surveillance logs and two other pieces of evidence should have been produced to Pelullo before the commencement of the 1991 trial. In the context of that *Brady* analysis, none of the surveillance information had been produced to Pelullo before the 1991 trial. Also, the Third Circuit based its *Brady* analysis on the cumulative effect of the absence of the surveillance logs and the two other pieces of evidence. *See Kyles v. Whitley*, 514 U.S. 419, 436, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). Here, Pelullo contends that the McKeen report and the Moran report should have been produced for the January 1995 trial. The Court's analysis of this new *Brady* claim must take into account the fact that Pelullo had the surveillance logs, and the two other pieces of impeachment evidence, available for use during the January 1995 trial. In short, the Third Circuit's *Brady* analysis in *Pelullo III* did not address the same *Brady* issue presented in this § 2255 petition. Accordingly, *Pelullo III* does not preclude this Court from conducting an independent analysis of the McKeen report and the Moran report under *Brady* principles.

 While the prior decisions of the Third Circuit do not preclude an independent analysis of Pelullo's *Brady* claim, the Third Circuit's most recent decision in this case does provide the Court with guidance in addressing the merits of Pelullo's claim. As the Supreme Court has stated, the failure of the government to produce evidence favorable to the defense does not constitute a *Brady* violation. *See Strickler v. Greene*, 527 U.S. 263, 281, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). Rather, proof of a *Brady* violation requires a showing that the failure to produce the fa-

vorable evidence caused the defendant prejudice, meaning that the evidence was material to the defense:

> [T]he term *"Brady* violation" is sometime used to refer to any breach of the broad obligation to disclose exculpatory evidence—that is, to any suppression of so-called *"Brady* material"—although, strictly speaking, there is never a real *"Brady* violation" unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict.

*Id.* at 281, 119 S.Ct. 1936.

In considering the prejudice element under *Brady,* the Court may consider: (a) the impeachment value of the suppressed evidence, *see Id.* at 291, 119 S.Ct. 1936; (b) whether the defendant had other impeachment evidence available to use at trial, *see Hollman v. Wilson,* 158 F.3d 177, 181–182 (3d Cir.1998); and (c) the weight of the government's evidence establishing the defendant's guilt. *See Strickler v. Greene,* 527 at 293, 119 S.Ct. 1936; *Hollman v. Wilson,* 158 F.3d at 182–83.

In *Pelullo III,* the Third Circuit affirmed this Court's conclusion that Pelullo would have testified in his own defense at the 1991 trial even if certain *Brady* evidence had been produced to him before trial. In its review of this Court's findings, the Third Circuit noted that this Court had "properly noted the questionable impeachment value of the surveillance logs." *United States v. Pelullo,* 173 F.3d 131, 142 (3d Cir.1999) (quoting *United States v. Pelullo,* 105 F.3d at 123 n. 3). The Third Circuit also affirmed this Court's factual finding that during the January 1995 trial, "Pelullo had a number of ways to impeach Leonetti's testimony...." *Id.* at 144. Finally, the Third Circuit also affirmed this Court's factual finding that, during the January 1995 trial: "Pelullo

had a significant amount of evidence that he could use in mounting a defense to Count 54." *Id.* These factual findings, which the Third Circuit has affirmed, provide the background for the Court's analysis of whether the alleged suppression of the McKeen report or the Moran report renders the jury verdicts in the 1995 trial unworthy of confidence.

Pelullo also contends that the Third Circuit's decision in *Pelullo II* precludes the Court from considering whether a *Brady* violation with respect to Count 55 based upon the McKeen report and the Moran report would have tainted the other counts of conviction. In *Pelullo II,* the Third Circuit considered whether the erroneous admission of Pelullo's conviction on Count 54 had a spillover effect on the other counts of conviction. In this petition, Pelullo contends that the failure to produce the McKeen report and the Moran report impaired his ability to impeach Leonetti with respect to RA 60. Again, the Third Circuit did not address this issue in *Pelullo II.* Therefore, the Court can conduct an independent analysis of whether any alleged *Brady* violation relating to the McKeen report and the Moran report tainted any other count of conviction.

## SURVEILLANCE INFORMATION ABOUT SCARFO AT LOCATIONS OTHER THAN HIS FLORIDA RESIDENCE IS NOT MATERIAL UNDER *BRADY.*

In Pelullo's response to the government's proposed Findings of Fact, he points to two meetings described in the McKeen report, at which surveillance was conducted, which are not mentioned in the surveillance logs. (Defense Exhibit 1). These meetings have absolutely no relevance to the defense theory in this case and cannot be relevant *Brady* material. One meeting was between Scarfo and

David Iacovetti on January 29, 1986 at Pumpernick's Restaurant in Hallendale, Florida; and the other meeting was between Scarfo and several associates on January 30, 1986 at the Pier 5 Restaurant in Hallendale, Florida.

This information is not relevant because the government never contended that Pelullo met with Scarfo at either Pumpernick's Restaurant or the Pier 5 Restaurant.

## REASONS FOR DENYING THE REQUEST FOR DISCOVERY.

Earlier in this Memorandum, it was mentioned that the Court denied Pelullo's request for discovery filed August 11, 2000, shortly before the hearing scheduled on August 24, 2000. I denied this request because the hearing had already been delayed 32 months while we waited for Mr. Pelullo to be returned from the State of Florida. If, in fact, there had been a need for discovery, it could have been conducted during that period, but was never requested. No reason was ever given for the delay in making the request. There was never any credible showing that discovery would uncover any evidence to assist Pelullo in proving the allegations of his petition.

In addition, we have the added circumstance that Pelullo in the first trial took the witness stand and admitted being at the Scarfo house on the two occasions referred to in pages 9–11 of this Memorandum.

## CONCLUSIONS OF LAW

Based on the foregoing, the Court makes the following Findings:

1. Pelullo has failed to establish that he did not possess the alleged *Brady* material during the 1995 trial.

2. The Court finds that even if Pelullo did not possess the alleged *Brady* material during the 1995 trial, Pelullo could have obtained the alleged *Brady* material for use at the 1995 trial through the exercise of due diligence.

3. The alleged *Brady* evidence was not material to Pelullo's defense.

4. Even assuming Pelullo did not have possession of the alleged *Brady* material, the absence of the McKeen report and the Moran report did not deprive Pelullo of a fair trial worthy of the Court's confidence.

5. Any prejudicial error with respect to Count 55 arising from the government's failure to produce the McKeen report or the Moran report to Pelullo before the 1995 trial did not taint the other wire fraud counts for which Pelullo was convicted.

6. Pelullo has failed to establish any grounds for additional discovery or for an additional continuance of the evidentiary hearing.

7. Pelullo has failed to make a substantial showing of a denial of a constitutional right. Accordingly, a Certificate of Appealability shall not issue.

We, therefore, enter the following Order.

## ORDER

AND NOW, this 24th day of APRIL, 2001, it is hereby ORDERED that Leonard A. Pelullo's Motion to Set Aside Convictions is DENIED with prejudice. Because Leonard A. Pelullo has not made a substantial showing of denial of a constitutional right, a Certificate of Appealability is not issued.