**BRYAN FELIX, Appellant**

**v.**

**GOVERNMENT OF THE VIRGIN ISLANDS, Appellee**

D.C. Crim. App. No. 2004/108

District Court of the Virgin Islands

Division of St. Croix

November 3, 2005

ERIC S. CHANCELLOR, ESQ., St. Croix, U.S.V.I., *for Appellant.*

MAUREEN PHELAN, AAG, St. Thomas, U.S.V.I., *for Appellee.*

FINCH, *Chief Judge, District Court of the Virgin Islands*; GOMEZ, *Judge of the District Court of the Virgin Islands*; and HOLLAR, *Judge of the Superior Court, Sitting by Designation.*

## MEMORANDUM OPINION

(November 3, 2005)

This matter is once again before this Court on appeal from the appellant's second motion for new trial, this time based on newly

discovered evidence. That motion followed our earlier reversal of the appellant's conviction and the Third Circuit's vacatur of the same for further development of the facts below. The single issue we now face today is whether the trial court erred in finding that the Government's failure to disclose the fact of a pending arrest warrant for a key prosecution witness and the victim in this case violated the appellant's due process right to a fair trial.

For the reasons more fully stated below, we will affirm the trial court's denial of the appellant's motion for new trial based on newly discovered evidence.

## I. STATEMENT OF FACTS & PROCEDURAL POSTURE

Several incidents are relevant to this appeal: the trial evidence and the appellant's conviction; the motion for new trial and the arrest warrant for Rodriquez giving rise to the *Brady* challenge; and the resulting appeals. Accordingly, the facts are set out as to each below.

### November 1999 Shooting

Bryan Felix ("Felix" or "appellant") was convicted of murder in the first degree, attempted murder, and unauthorized possession of a firearm, in connection with the shooting death of Miguel Crispin ("Crispin") and the infliction of two gunshot wounds to Leonardo Rodriquez ("Rodriquez") in downtown Christiansted.

The events leading up to that shooting unfolded on November 6, 1999 when three Black Men, Felix, Leon Isaac ("Isaac") and Kasim Williams ("Williams"), went to a food van on Church Street, Christiansted. They rode in a red Mitsubishi Mirage driven by Isaac. There, they encountered three Hispanic men in a white Mitsubishi: Rodriquez, Crispin, and Jose Mercado ("Mercado"). [Supplemental Appendix ("Supplemental App.") at 84-87; 250-51].

Rodriquez described Isaac as "heavy-set." [*Id.* at 87]. Police Detective Terrence Desormeaux said that, based on a police chart used to measure the men's height, both Isaac and Williams were 6 feet, one inch tall, and Felix was the shorter of the three, at about 5'6" tall without his dreadlocks and 5'7.5" tall with his dreadlocks. [*Id.* at 225-34]. Gale Clark ("Clark"),the proprietor of the food van where the incident occurred, described the apparent shooter as "small-built" and short in comparison to her, wearing dreadlocks. [*Id.* At 77-83].

Rodriquez and Isaac had a prior disagreement and, upon seeing each other, got into a fight. [Supplemental App. at 85-87, 96-97]. As the two fought, Mercado also got into a fight with one of the men from the red car, whom he described as tall and slim but could not identify at trial by name. [Supplemental App. at 87, 126]. He said that man fought him with a 2x4 board.

As the four men fought, several shots were fired. Rodriquez testified he stopped fighting and pushed away from Isaac after he heard gunshots. It was then that he said he came face to face with Felix pointing a gun at him:

> At the same time, me and the brother was still just fighting, grab on; I didn't loose he; he didn't loose me. When I hear the shot fired, I push off, and I end up like in the middle of the road now. The middle of the road, like in between right deh in the middle. This man yah facing me, this man yah facing me with the—sorry, with the gun, pointing straight at me and bus' two of them after me. [sic].

[Supplemental App. at 88]. Rodriquez said he was in close proximity to Felix when he was shot, estimated at trial at 15-20 feet. [*Id.* at 90]. After being shot, Rodriquez ran a short distance away to where he was later found laying on a gallery on nearby Company Street.

Rodriquez said he knew Felix for quite some time prior to the incident and had talked to him on previous occasions, but had no prior disagreement with him; Felix testified similarly that he had never had problems with Rodriquez. Though admitting he was not sure who fired the initial shots he heard before he was struck, Rodriquez unequivocally testified that Felix was the person who faced him and shot him twice. [*Id.* at 88-97]. Rodriquez identified Felix as the shooter just days after the shooting, on November 9, 1999, while he was hospitalized from his gunshot wounds. [*Id.* at 93-110].

Mercado testified that, at the time shots were fired, two officers had already parted the fight he was involved in and had subdued both him and his adversary on the ground. Within seconds of the first shots being fired, he saw Crispin running past him. [*Id.* at 127-28]. He said an officer then took him to where Crispin fell, dying, in the Post Office yard. [*Id.* at 128]. Crispin later died of a gunshot wound to the back.

Consistent with Mercado's testimony, Narcotics Agent George Osborne, who was in the area conducting a separate investigation at the time the incident began, also testified he parted a fight involving two men, both of whom appeared Hispanic. One of the men was beating the other with a 2x4 board. Osborne said he had both men detained at the time the shots were fired and when Crispin ran by. [*Id.* at 66]. Osborne further testified that the man who was earlier being beaten with the board, apparently Mercado, went to Crispin's aid after he fell from gunshot wounds. [*Id.* at 65-68]. At trial, Osborne could not identify the two men he parted and then detained by name but noted, "If I see them, I may know them." [*Id.*]. He described them as "two-midweight individuals, not too short or too tall, and Hispanic-type looking." [*Id.* at 66].

Felix also testified at trial that he knew Rodriquez, and he said the incident leading to the shooting stemmed from a disagreement between Rodriquez and Isaac. [*Id.* at 257-58]. He similarly testified that Rodriquez and Isaac were fighting and said he was just "telling them to hold it down." [*Id.* at 259]. Felix said he just stayed in the area for awhile, and was at the side of the food van when he heard the gunshots. [*Id.*]. Following the shooting, he admitted reentering the red Mirage with his two friends and attempting to flee the area. Felix did not testify to fighting with anyone at the scene. He denied being the shooter, however.

Clark, the proprietor of the food van, said she also fled the area, anticipating a shooting, after she heard one of the Black men whom she described as "small-built" and short in relation to her declare, "I'm goin' take care of this," while heading in the direction of a car. [*Id.* at 77]. Clark immediately fled up King Street and moments later heard gunshots.

At trial, Rodriquez was the only person who could testify he saw Felix fire the gun.

A police officer arriving on the scene following the incident encountered Felix, Isaac and Williams as they attempted to drive away in the red car, reversing down Church Street. [*Id.* at 114; *see also* 119-20]. The three men initially ignored the officer's command to stop, but complied after the officer "cranked" his shotgun and commanded them at gunpoint to do so. [*Id.* at 114].

Police determined five shots had been fired: two struck Rodriquez, one struck Crispin, and police determined one was fired into the white

Mitsubishi; another was found close to the driver's side of that car. [*Id.* at 169-73]. The gun determined to have been the source of all the shots was also recovered laying in mud in the immediate area. [*Id.* at 165-178].

Mercado also testified at trial that in December, 2000, while detained in the Anna's Hope Detention Center in connection with narcotics charges, he encountered Felix, who was also detained there in connection with the instant case. He said Felix called him aside and told him: "Well, if Leo Rodriquez didn't come to court, that he would be a free man." [Supplemental App. at 131; 129-34]. He explained he construed that to mean that Rodriquez was the only one who could identify. Felix as the shooter. Mercado further testified that during that encounter Felix apologized for the shooting incident. [*Id.*].

Felix was convicted of murder first degree, attempted murder, and unauthorized possession of a firearm, in connection with the November 1999 shooting. He was sentenced to incarceration for the remainder of his natural life, without chance of parole, or 85 years imprisonment on Count I; 10 years imprisonment on Count II, and 15 years imprisonment on Count III, all to be served concurrently. [Appendix ("App.") at 1 [Judgment and Commitment entered March 1, 2001]]. He timely appealed that conviction.

### Arrest Warrant for Rodriquez

On September 8, 2000—ten months after the shooting for which Felix was convicted—an armed robbery occurred at the Cool Out Bar in Estate Peter's Rest. Several days later, on September 19, 2000, Rodriquez was identified as one of perpetrators of that crime. [App. at 20-23 (Affidavit dated January 8, 2001 in Support of Probable Cause for Arrest)]. On January 8, 2001—approximately one week before Felix's trial and 14 months after Rodriquez identified Felix as the shooter in the 1999 incident—a warrant for Rodriquez's arrest was entered by the trial court in connection with the robbery. [*Id.* at 24]. Rodriquez was arrested under that warrant on March 13, 2001, after Felix was sentenced in this case. [App. at 25 (Arrest Report)].

### The Initial Appeal

Felix timely appealed his conviction to this Court, arguing, *inter alia,* that a new trial was warranted where the Government had failed to disclose the pending criminal investigation and arrest warrant against its

key witness, in violation of his right to a fair trial. In support therefor, Felix submitted in the appellate record: a February 6, 2002 affidavit signed by Rodriquez purportedly recanting his trial identification of Felix as the shooter, [*see* App. at 26]; a copy of the arrest warrant for Rodriquez; the arrest report evidencing Rodriquez's arrest; and a pre-sentence report in Rodriquez's case. Those documents had not been considered by the trial court.

After considering the entire appellate record, including the materials noted above, this Court reversed the appellant's conviction, claiming the Government's non-disclosure constituted a material *Brady* violation. *See Felix v. Government of Virgin Islands*, 290 F. Supp. 2d 625, 630-31 (D.V.I. App. Div. 2002). We noted with particular significance the recantation contained in the affidavit, noting: "While the Appellant does not allege that [Rodriquez] had arranged a plea agreement with the government, this inference on the Appellant's behalf is buttressed by the affidavit of Rodriquez dated February 6, 2002, in which Rodriquez recants his testimony stating that he did not testify truthfully at trial." [*Id.* at 631]. We, therefore, held that without the *Brady* violation, the case against the appellant was weak and that there was a reasonable probability the undisclosed information about the warrant would have led to a different outcome in Felix's case. *Id.*

On further appeal by the Government, the court of appeals reversed this Court's determination, without reaching its merits, holding that the extrarecord materials noted above were improperly considered, in violation of appellate procedure. *See Gov't of the Virgin Islands v. Felix*, 85 Fed. Appx. 288 (3d Cir. 2003). That Court therefore remanded to the trial court with instructions for the appellant to file a motion for new trial based on newly discovered evidence, to permit the trial court an opportunity to consider the post-trial affidavit and other materials submitted on appeal. *Id.* (noting that was the proper procedure where new evidence discovered while case was on appeal).

### Current Appeal

While that appeal was pending in the court of appeals, the appellant on February 23, 2003 filed a motion for new trial based on newly discovered evidence, to preserve the right to do so within the two-year period required by the applicable local rule. *See* SUP. CT. R. 135.

Following the Third Circuit's decision, the trial court held an evidentiary hearing on the new trial motion. At that hearing, the trial court heard testimony from Rodriquez and Police Detective Lorrenie Hassell, the investigating officer in the "Cool Out" robbery case. The defense did not question Hassell about her reasons for delaying Rodriquez's arrest, nor were any questions posed to either witness regarding whether Rodriquez was aware of the investigation or the warrant against him prior to his arrest for the "Cool Out" Robbery. Rodriquez testified, however, that at some point prior to his arrest he had gone to the U.S. mainland, although he could not recall whether it was prior to or after Felix's trial. [App. at 37-38]. He denied his trial testimony was false and, although he admitted to signing the affidavit, he testified that, because of his inability to read, he did not know that its contents purported to recant his trial testimony.[1] [*Id.* at 38-39]. Rodriquez testified as followed:

> Q   All right. So you understand what was in that document when you signed it; is that correct?
>
> A   No. How am I going to understand? I don't know how to read. You know what you did. You know what you did. I tell you who shot me. I tell you straight up who shot me. ... You are trying to scheme me out.

[App. at 40-41]. On later questioning, Rodriquez said a pre-prepared document was brought to him by the defense attorney, and he signed the document without reading it after it was explained to be "something different." [*Id.* at 43]. The defense offered no evidence to counter that testimony.

After considering the new evidence submitted, the court found the affidavit was "not credible" where: Rodriquez testified he could not read and had signed the affidavit after representations by Felix's defense counsel that it was something else than it was; that Felix's defense attorney was the only other person present when the affidavit was signed; where Rodriquez reiterated that Felix had been the shooter; and where the defense offered no contrary testimony to contradict Rodriquez's

---

[1]   Rodriquez had similarly testified at Felix's trial that he could not read very much, after being unable to refer to a document at the request of counsel for the purpose of refreshing his recollection. [Supplemental App. at 106-08].

testimony surrounding the making of the affidavit. [*See* App. at 50 (Order Denying Motion for New Trial)].

The court ultimately denied the motion for new trial, holding the new impeachment evidence was an improper basis for new trial and, alternatively, that the evidence was neither favorable nor material to the prosecution. [App. at 48-50]. This timely appeal followed.

## II. DISCUSSION

### A. Jurisdiction & Standard of Review

This Court has jurisdiction to consider final orders or judgments entered by the Superior Court in criminal cases, and to consider a motion for new trial based on newly discovered evidence brought within two years of such judgment. *See* The Omnibus Justice Act of 2005, Act No. 6730, § 54 (amending Act No. 6687 (2004), which repealed 4 V.I.C. §§ 33-40, and reinstating appellate jurisdiction in this Court); Revised Organic Act of 1954 § 23A, 48 U.S.C. § 1613a;[2] *see also* SUP. CT. R. 135.

We generally review findings of fact for clear error and review *de novo* the trial court's determinations of law. *See Poleon v. Government of the V.I.*, 184 F. Supp. 2d 428 (D.V.I. App. Div. 2002); *Bryan v. Government of the V.I.*, 150 F. Supp. 2d 821, 827 n.7 (D.V.I. App. Div. 2001).

■ Where the order appealed from is one granting or denying a new trial, we review the trial court's determination for abuse of discretion. *See Government of the V.I. v. Sampson*, 94 F. Supp. 2d 639, 643, 42 V.I. 247 (D.V.I. App. Div. 2000) (citations omitted). However, where a *Brady* violation is asserted as the basis for a new trial request, presenting a mixed question of law and fact, this Court must review issues of law *de novo* and factual findings for clear error. *See United States v. Perdomo*, 929 F.2d 967,969-70 (3d Cir. 1991); *Joseph v. Gov't of the V.I.*, 2001 U.S. Dist. LEXIS 22169 (D.V.I. App. Div. 2001) (citing *United States v. Ramos*, 27 F.3d 65, 67 (3d Cir. 1994)). In that regard, we note that the ultimate determination of materiality of evidence, for the purposes of

---

[2]    The complete Revised Organic Act of 1954 is found at 48 U.S.C. §§ 1541-1645 (1995 & Supp. 2003), *reprinted in* V.I. CODE ANN. 73-177, Historical Documents, Organic Acts, and U.S. Constitution (1995 & Supp. 2003) (preceding V.I. CODE ANN. tit. 1).

determining whether a *Brady* violation occurred, is a question of law to which we afford plenary review. *See Government of the V.I. v. Fahie,* 304 F. Supp. 2d 669, 672-73, 45 V.I. 475 (D.V.I. App. Div. 2004) (citing *United States v. Bagnall,* 907 F.2d 432, 435 (3d Cir. 1990)).

## B. The Trial Court Did Not Err in Denying the Instant Motion for New Trial.

The appellant's contention is that the government impinged on his constitutional right to a fair trial by failing to reveal at trial that there was then a pending warrant for the arrest of one of its key witnesses, in connection with an unrelated armed robbery that occurred during the pendency of the charges against Felix. The appellant further contends the government purposely delayed executing that warrant until two weeks after his sentencing, depriving him of the opportunity to impeach the witness' credibility, in violation of *Brady.*

The government refutes these assertions, arguing the information regarding Rodriquez's pending arrest was not favorable to the appellant and he suffered no prejudice as a result of its failure to disclose, where the appellant adduced no evidence at the new trial hearing that Rodriquez was aware of the pending warrant.

The trial court, in denying Felix's motion for new trial, similarly held, *inker alia,* that the warrant was neither favorable nor material to the trial where there was no evidence that Rodriquez was aware of it and where the witness identified the appellant 14 months prior to issuance of the arrest warrant, thus negating its impeachment value. [Supplemental App. at 47-48].

In accordance with the United States Supreme Court's direction in *Brady v. Maryland,* 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), a prosecutor is required to disclose to a defendant evidence that is exculpatory or material to the accused's guilt or innocence, and the failure to do so deprives the defendant of a constitutionally fair trial. *See Perdomo,* 929 F.2d at 970 (citing *Brady v. Maryland,* cited *supra*); *see also, United States v. Bagley,* 473 U.S. 667, 675, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985). In *Giglio v. United States,* 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972), the high Court extended *Brady's* disclosure requirement to evidence that may be used to impeach the credibility of a government witness. *See Giglio,* 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (*citing Napue v. Illinois,* 360 U.S. 264, 269, 79 S.

Ct. 1173, 3 L. Ed. 2d 1217 (1959)). Such disclosure is required when the reliability of that witness bears heavily on a criminal defendant's guilt or innocence. *See Giglio,* 405 U.S. at 154-55; *United States v. Milan,* 304 F.3d 273, 287 (3d Cir. 2002) (noting that under *Giglio,* "the government must disclose materials that go to the question of guilt or innocence as well as materials that might affect the jury's judgment of the credibility of a crucial prosecution witness").

■ To warrant a new trial based on the mandates of *Brady* and *Giglio,* however, a defendant must establish: 1) that the prosecutor withheld evidence, 2) that the evidence suppressed was favorable to the defense and 3) that the evidence suppressed was material to the defense. *See United States v. Pelullo,* 105 F.3d 117, 122 (3d Cir. 1997); *Perdomo,* 929 F.2d at 970-74; *see also Milan,* 304 F.3d 273, 287 (similarly noting that the standard for *Giglio* determinations is that "the withheld evidence must be material, that is, of sufficient significance that its suppression deprived the defendant of a fair trial") (citations omitted).

Having fully reviewed the appellant's arguments and the applicable law, we conclude the appellant is not entitled to a new trial.

### 1. The Impeachment Evidence Was Not Favorable to the Defense.[3]

■ Exculpatory or impeaching information is "favorable" evidence which must be disclosed. *See United States v. Boone,* 279 F.3d 163, 189-90 (3d Cir. 2002). Although a witness' criminal history may be subject to disclosure for impeachment purposes under *Brady, see Perdomo,* 929 F.2d 967 (considering non-disclosure of record of convictions), the scope of permissible impeachment information is generally limited to convictions. *See e.g., Michelson v. United States,* 335 U.S. 469, 482, 69 S. Ct. 213, 93 L. Ed. 168 (1948) (noting, "Arrest without more does not, in law any more than in reason, impeach the integrity or impair the credibility of a witness. It happens to the innocent as well as the guilty. Only a conviction, therefore, may be inquired about to undermine the trustworthiness of a witness."); *compare,* FED. R. EVID. 608(b) and advisory committee notes; 609(a). However, the fact of a pending prosecution or arrest may also constitute favorable impeachment evidence within the meaning of *Brady,* where it tends to establish the

---

[3] The Government concedes it failed to disclose to the defense information regarding the warrant for Rodriquez's arrest, satisfying the first *Brady* prong.

witness' biases or motives to testify falsely. *See United States v. Harris*, 498 F.2d 1164, 1169 (3d Cir. 1974); *Giglio*, 405 U.S. at 154-55. We would have great difficulty in concluding that evidence of the pending warrant for Rodriquez's arrest was favorable to the appellant under the facts of this case.

We note initially that Rodriquez was the victim of a very serious crime and not a mere witness or participant motivated principally by concerns for his own liberty. In addition, consistent with the appellant's testimony, Rodriquez testified he knew Felix prior to the altercation. Rodriquez additionally testified that Felix stood directly in front of him just a few feet away and fired the shots. He was unequivocal in his position, just days following the crime and at trial, that Felix was the perpetrator.

Of primary significance is the timing of Rodriquez's identification of Felix as the person who shot him. Rodriquez made that identification immediately after he was shot, while still hospitalized. That identification occurred 14 months prior to issuance of the arrest warrant, and 10 months before Rodriquez is even alleged to have committed the robbery. Further, Rodriquez's trial testimony was consistent with his immediate identification of Felix as the perpetrator of the crime against him. Given his consistent identification of Felix as the perpetrator and the lapse of almost one year between the time he made that initial identification to police and when he is alleged to have committed the robbery, there is no basis for concluding that Rodriquez's initial identification was made in contemplation of favorable treatment or that the impending robbery prosecution was otherwise relevant to motive or bias on that issue or material to Felix's guilt or innocence.[4] *See e.g., Marshall v. Hendricks*, 307 F.3d 36, 56 (3d Cir. 2002) (finding non-disclosure of immunity agreement for impeachment immaterial where the witness' statement to police prior to and after that agreement was the same, and where no evidence that witness, when giving the initial statement to police immediately after the crime, was even contemplating an immunity agreement).

---

[4] In reaching that determination, we do not consider the affidavit offered in support of the new trial motion. The trial court found that affidavit not to be credible evidence, given Rodriquez' testimony at the evidentiary hearing, and there is no basis on this record for finding the court's determination regarding the credibility of the affidavit to be clearly erroneous in light of the evidence presented.

■ Moreover, there is an absence of any evidence that Rodriquez entered into an agreement with the Government in exchange for his testimony, or was motivated by hopes of leniency in the separate case. At the new trial hearing, the appellant questioned neither the case agent in the robbery case nor Rodriquez regarding his knowledge of the pending warrant. Therefore, there is no evidence on the record to suggest that Rodriquez was even aware of the pending warrant, to permit an inference that he was potentially biased or motivated by concerns for leniency in the separate crime. While we have uncovered no mandatory cases directly on point, we find analogous cases considered by other courts persuasive for the proposition that, because bias or motive must necessarily require knowledge of the basis for such bias, "Impeachment evidence is not material if the witness does not have knowledge of the underlying fact." *Williams v. Scott*, 35 F.3d 159, 161-62 (5th Cir. 1994) (finding non-disclosure of witness' plea agreement non-material for *Giglio* purposes, where agreement entered with defense counsel, and prosecutor also entered into agreement with counsel not to disclose agreement with his client prior to him testifying at trial; holding such impeachment evidence not material where witness unaware of it), *cert. denied*, 513 U.S. 1137, 115 S. Ct. 959, 130 L. Ed. 2d 901 (1995) (citing *United States v. Nixon*, 881 F.2d 1305, 1309 (5th Cir. 1989); *Willhoite v. Vasquez*, 921 F.2d 247, 249 (9th Cir. 1990)); *compare, McCloud v. United States*, 781 A.2d 744, 753 (D.C. Cir. 2001) (noting that, to be deemed material for bias cross-examination, the foundation for bias must be shown, including evidence that the witness is aware of the facts forming the basis of the suspected bias) (citations omitted); *Ifelowo v. United States*, 778 A.2d 285, 295 (D.C. Cir. 2001) (rejecting challenge to trial court's denial of cross-examination of witness for bias based on a "promise" from the government, where the witness was unaware of the promise; noting materiality not shown where witness has no knowledge of the underlying fact).

■ In the absence of evidence Rodriquez knew of the warrant, its existence was of little impeachment value and, therefore, not favorable to the defense. Accordingly, its non-disclosure did not violate *Brady*.

## 2. The Evidence Was Not Material.

Were we to find the undisclosed information favorable, we would, nonetheless, affirm the trial court's denial of Appellant's new trial

motion, based on the lack of materiality of that evidence to Felix's conviction.

■ The third *Brady* prong is satisfied where "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Perdomo*, 929 F.2d at 971 (quoting *United States v. Bagley*, 473 U.S. 667, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985)). "A reasonable probability is [defined as] a probability sufficient to undermine confidence in the outcome." *Id.* (noting that this "inquiry requires consideration of the totality of the circumstances, including possible effects of non-disclosure on the defense's trial preparation") (citing *Government of V.I. v. Martinez*, 780 F.2d 302, 306 (3d Cir. 1985) (quoting *Bagley*, 105 S. Ct. at 3384)). Such evidence includes admissible evidence or information that would have assisted the defense in finding admissible evidence, aiding witness preparation, corroborating testimony, impeaching or rebutting the prosecution's evidence, or supporting some affirmative defense. *Id.*; *Pelullo*, 105 F.3d at 123.

As we have previously noted, "[The] touchstone of materiality is a reasonable probability of a different result ... The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A reasonable probability of a different result is accordingly shown when the government's evidentiary suppression undermines confidence in the outcome of the trial." *Fahie*, 304 F. Supp. 2d at 672-73 (quoting *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995) (internal citations and quotation marks omitted); *Marshall*, 307 F.3d at 53 (same). In making this determination, we are to consider the undisclosed evidence in conjunction with all of the other evidence at trial. *See Pelullo*, 105 F.3d at 123 (noting that materiality of suppressed evidence is to be considered collectively with the other evidence in the case, not item by item).

■ In the absence of any indication that Rodriguez identified Felix as the shooter in contemplation of leniency in the robbery prosecution against him, or was even aware of the pending warrant, as earlier noted, the prosecution's failure to disclose the existence of that warrant did not affect the integrity of Felix's trial and bore little relevance to his guilt or innocence. *See* FED. R. EVID. 401-402; 608(b), advisory committee notes

(noting that evidence related to impeachment for bias governed by Rule 402); *see also, Marshall*, 307 F.3d at 56; *Williams*, 35 F.3d at 161-62; *compare, McCloud*, 781 A.2d at 753 (D.C. Cir. 2001); *Ifelowo*, 778 A.2d at 295.

Moreover, although undoubtedly compelling, Rodriguez's testimony was not the only evidence implicating Felix in the crime. Rather, the jury also had before it strong circumstantial evidence supporting a finding that Felix was the perpetrator of the crimes against Crispin and Rodriguez. In addition to Felix's testimony admitting that he was at the scene with the other two Black men who encountered Rodriquez's group and that he was not engaged in a fist fight, as the other men were, at the time shots were fired, the jury also had evidence accounting for the location of all of the other individuals when the shots that killed Crispin and injured Rodriguez were fired, and evidence directly implicating Felix, to wit:

1. There were six men involved in the incident that night, including Felix;

2. Rodriquez [sic] was engaged in a fight with Isaac;

3. Mercado was engaged with another tall, slim man, described as Hispanic-looking and who neither Mercado nor Osborne testified was Felix, despite the testimony that the other man could be identified if seen;

4. Osborne's testimony that he had both Mercado and the other man with whom he had been fighting detained at the time the shots were fired;

5. Evidence regarding the description of each of the six men;

6. Clark's testimony regarding the shooter's description and actions immediately before the shooting;

7. Forensic evidence regarding the location of bullet casings recovered, indicating Crispin was likely sitting in the white Mitsubishi when shot and not engaged in a fight with anyone;

8. Testimony by police, and Felix's admission, that he was caught fleeing the scene with his two friends after the shooting;

9.   The discovery of the gun nearby and forensic evidence that one gun was used in the shootings;

10. Mercado's testimony regarding his encounter with Felix at the detention center, during which Felix admitted to the crimes and apologized for the shootings, and further indicated he could be free if Rodriguez refrained from testifying against him.

Given the totality of the evidence at trial, we hold that non-disclosure of evidence of the arrest warrant did not undermine Felix's trial.

## III. CONCLUSION

The appellant is not entitled to a new trial, because the evidence which the Government failed to disclose at trial was neither favorable nor material to the defense under the standards developed pursuant to *Brady* and *Giglio*. Accordingly, we will affirm the trial court's denial of Felix's motion for new trial based on newly discovered evidence. An appropriate order follows.